IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                    Plaintiff,

          vs.                              **Case No. 10-40121-01/02-RDR**

JESUS ALVAREZ-MORA and
ANTHONY VILLALOBOS-CASTILLO,

                    Defendants.

_____

<u>**MEMORANDUM AND ORDER**</u>

This matter is presently before the court upon the motions to suppress filed by defendants Jesus Alvarez-Mora and Anthony Villalobos-Castillo.  The court conducted two hearings on these motions.  At the conclusion of the second hearing, the court asked counsel if they wanted to offer any arguments on the issues they had raised in their motions.  Each defendant asked for two weeks to provide a written brief to the court.  The government asked for one week to respond to the briefs filed by the defendants.  The court granted the parties' requests.  Recently, the defendants advised the court that they did not intend to file any further briefs or make any additional arguments.  Accordingly, the earlier motions filed by the defendants are now taken under advisement, and the court is now prepared to rule.

The defendants are charged in a one-count indictment.  They are charged with possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of

methamphetamine in violation of 21 U.S.C. § 841(a)(1).  Based upon the evidence presented at the two prior hearings, the court now issues the following findings of fact and conclusions of law.

FINDINGS OF FACT

1.  On July 8, 2010, Jarrett Ranieri of the Kansas Highway Patrol (KHP) was conducting a drug ruse check lane on Interstate 70 in Wabaunsee County, Kansas.  Trooper Ranieri was working with another KHP trooper, Luka Henderson.  Law enforcement officers use drug ruse check lanes to trick travelers who are carrying drugs into exiting the highway in order to avoid the illusory check lane. The officers had placed two signs on I-70 just prior to Exit 322, which was an exit to Tallgrass Road.  The signs read:  "Drug Check Lane Ahead" and "Drug Dog In Use."  The signs had been placed in the area before Exit 322 because it was an exit that led to a rural gravel road with no services.  The officers had parked Trooper Henderson's patrol car on I-70 beyond Exit 322 with its emergency lights on.  The purpose of the placement of Trooper Henderson's patrol car was to suggest that a check lane was actually being conducted just beyond the exit.  Troopers Ranieri and Henderson were both in Trooper Ranieri's marked patrol car hidden underneath the overpass on the road of the exit.  They could not see I-70 from their vantage point underneath the overpass.

2.  Trooper Ranieri has been with the KHP for eleven years. His responsibilities are to enforce criminal and traffic laws.  He

has received training in the interdiction of drug trafficking. Trooper Henderson has been employed by the KHP for about six years. He has also received drug interdiction training.

3. At approximately 10:30 p.m., the officers noticed a gold F-150 Ford pickup truck exiting I-70. It was dark, but the officers could see the truck turn north toward them without stopping at the stop sign that sits at the end of the exit. Trooper Ranieri observed that the truck blew through the stop sign at a quick pace. Trooper Ranieri turned on the emergency lights of his patrol car and followed the pickup truck to stop it for a traffic violation of failing to stop at the stop sign. The pickup truck pulled to the side of the road.

4. Trooper Ranieri's patrol car is equipped with a video camera. The camera recorded the stop of the truck. The camera has audio capabilities, but those capabilities had inadvertently been disabled because Trooper Henderson was attempting to charge his microphone in Trooper Ranieri's video camera. This effort by Trooper Henderson prevented Trooper Ranieri's microphone from working. Neither trooper was aware that the audio was not working during the stop.

5. Trooper Ranieri approached the truck on the driver's side. Trooper Henderson remained in the patrol car. The driver's side window was down. Trooper Ranieri had a flashlight and used it to illuminate the inside of the truck. He noticed that the truck

3

contained two individuals.  He observed they were both Hispanic males.  During the encounter, both occupants of the truck spoke English.  Trooper Ranieri had no trouble communicating with them. He asked for their drivers' licenses and insurance card.  All of the requested information was provided to Trooper Ranieri.  He learned that the driver was Anthony Villalobos-Castillo and the passenger was Jesus Alvarez-Mora.  He also learned that the owner of the truck was Cinthia Ramirez, who he later learned was the wife of Villalobos-Castillo.  He told them what he had observed and asked them about their travel plans.  He was told that they were returning from Junction City where they had been doing construction work.  He was also told they were traveling to Wamego, Kansas. Trooper Ranieri found these explanations unusual because they did not appear to be wearing clothes that had been worn for construction work, and Exit 322 was not a direct route to Wamego. As he stood at the driver's window, Trooper Ranieri could smell burnt and raw marijuana.  He also could smell air freshener.  He was aware that air freshener was often used by drug traffickers to mask the odor of the drugs.  He thought that both individuals appeared extremely nervous.  He thought they were more nervous than the ordinary person stopped for a traffic violation.  He noticed their hands were shaking.  He also noted that the driver was at a loss for words when he asked why they had exited at that location. The passenger answered the question.

6.  Trooper Ranieri returned to his car and ran checks on the drivers' licenses and the registration of the truck.  He discovered no problems.  After approximately three minutes, he returned to the driver's side window and returned the documents he had received. He warned them about the traffic violation and thanked them.  He stepped back from the window, but then quickly reapproached it.  He asked if there were any illegal drugs or guns in their vehicle.  He noted that the driver "froze up" and did not answer.  The passenger answered no.  He noted that he could smell marijuana coming from the truck and he asked if they had smoked any.  The passenger said his wife's friends had smoked some in there.  Trooper Ranieri asked if could search the truck.  Alvarez-Mora said no.  He said they needed to get going.  Trooper Ranieri then asked them to step out of the truck because he believed he had probable cause to search it.

7.  Trooper Ranieri thought he had probable cause to search the truck based upon the following factors:  the odor of marijuana, the actions by the driver in exiting I-70 after the drug ruse check lane signs, the smell of the air freshener, the nervousness of the occupants, and the explanations offered by occupants concerning their travel plans.

8.  Trooper Ranieri motioned to Trooper Henderson to exit the patrol car and assist him.  They patted down the occupants to determine if they had any weapons.  The occupants stood

approximately ten feet from the truck at the side of the road.
Trooper Ranieri entered the truck on the driver's side. Trooper
Henderson entered it on the passenger side. Trooper Ranieri saw
large amounts of leafy residue in the center console. Trooper
Henderson found methamphetamine in brick form in a rear compartment
of the truck.

9.  Alvarez-Mora and Villalobos-Castillo were placed under
arrest. They were residents of Topeka. The Topeka Police
Department (TPD) was contacted and instructed to do "knock and
talks" at their residences. A "knock and talk" is an effort by law
enforcement to engage individuals in a consensual police encounter.
Topeka police officers Scott Scurlock, Robert Youse and Patrick
Salmon were dispatched to the residence of Alvarez-Mora. They were
directed to look for evidence of the sale or manufacture of
methamphetamine. All three officers are veterans of the TPD. Each
had received considerable narcotics training.

10.  At approximately 1:15 a.m., Officers Scurlock and Youse
approached the front door of the Alvarez-Mora residence. Officer
Salmon went to the back of the residence for officer safety and to
make sure no one fled.

11.  Officer Scurlock was wearing blue jeans and a tee shirt.
He also had on a black vest that read "Police." The vest also had
his badge attached to it as well as a taser. Officer Youse was
similarly dressed except his vest did not contain a taser. Officer

Salmon was wearing his regular police uniform.  All carried side arms.  The porch light was on at the residence.  They also noticed that lights were on in the house.

12.  Officer Scurlock knocked on the door.  He noted that the door was closed but not latched.  A Hispanic male, who appeared to be a young adult and was later identified as Juan Alvarez, answered the door.  Alvarez is a cousin of Alvarez-Mora.  He did not live at the house.  He was just visiting.  Officer Scurlock identified himself and asked Alvarez if he could talk with him.  Alvarez said either "come on in" or "sure" and immediately stepped back, allowing them to enter the residence.  They entered the living room which was just inside the front door.  The television was on and the officers saw two other Hispanic individuals, a woman and another man.  All of the occupants in the house were dressed in street clothes.  The individuals appeared to have been watching television when the officers arrived at the house.  Officer Scurlock called Officer Salmon and told him to come in the front door.  He came around from the back and entered into the house.

13.  Officer Scurlock asked the individuals in the house to be seated in the living room, and they complied.  He then asked them to provide identification and each did so.  The officers learned that the woman, Reina Robles, lived there with Alvarez-Mora and their eight-month-old baby.  The other male was identified as Amado Lechuga-Hernandez.

14.    Officer  Scurlock  told  them  that  he  had  received information that there might be illegal drugs at this residence. He asked Ms. Robles if there were any illegal drugs there.   She said no.  He then asked if he could search for drugs.  She said yes.  Officer Scurlock asked these questions in a casual tone.  Ms. Robles  appeared  to  understand  the  questions  and  she  responded without hesitation.   The officers did not draw their weapons.

15.  The officers began searching the house.  The individuals in the house raised no objection at any time during the search.  In the living room, the officers found two suitcases.  They searched them but found nothing.  In the dining room, they found a large sack of horse feed.  Ms. Robles was asked about the horse feed and she said that it had appeared when she returned from a trip.  In the bathroom, Officer Scurlock found two black candles that displayed the figure of Santa Muerte.  Officer Scurlock was aware that Santa Muerte translated as "Saint Death."  He was further aware that drug traffickers often had such candles as a symbol to protect them from law enforcement.  During the search of the kitchen, Officer Scurlock found a vacuum sealer which he was aware that drug traffickers often used to package narcotics. Officer Scurlock also found a plastic baggie with a crystalline substance in it in a cabinet in the kitchen.  This substance field tested for methamphetamine.  After the substance was found that the officers believed was methamphetamine, Officer Salmon made a protective

sweep to determine if there was anybody else in the residence.  He located a baby in a crib in the bedroom.  At that time, the officers stopped searching and left to seek a search warrant.  A search warrant was subsequently issued by a state court judge.

CONCLUSIONS OF LAW

1.  In his motion to suppress, Villalobos-Castillo challenges the search of the vehicle on July 8, 2010.  He argues that all the evidence seized from the vehicle during that search should be suppressed.  He contends that (1) he was illegally detained following the issuance of the warning ticket; and (2) the subsequent search was illegal because the officers did not have a reasonable suspicion to detain him, did not have consent, and they could not have obtained a search warrant.

In his motion to suppress and in a supplemental memorandum, Alvarez-Mora challenges both the search of the truck on July 8, 2010, and the search of his residence on July 9, 2010.  He contends that all the evidence seized during these searches should be suppressed.  He contends that he was illegally detained at the time of the traffic stop after the issuance of the warning ticket because the officer was acting only on a hunch that "something might be awry." He further argues that the search of his residence was illegal because (1) the officers never received consent to enter the house or to search the house; (2) even assuming arguendo that consent to enter was given, that consent was not given by

9

anyone with actual or apparent authority to do so; and (3) even if the officers were lawfully in the residence and received consent to search, the consent was not freely and voluntarily given.

The government has responded that Alvarez-Mora does not have standing to contest the search of the truck. The government further contends that (1) the initial stop of the truck was justified by the observation that the truck failed to come to a complete stop at a stop sign; (2) the continued detention of the defendants after the initial stop was complete was justified by reasonable suspicion that the vehicle was being used to transport illegal drugs; and (3) the trooper had probable cause to search the pickup based upon his detection of the odor of raw marijuana coupled with other observations.

The government has responded to Alvarez-Mora's motion by contending that (1) Juan Alvarez had actual or apparent authority to allow the officers into the residence; (2) the officers had valid and voluntary consent to search the residence; and (3) even if Alvarez lacked both actual and apparent authority to grant the officers entry into the residence and consent to search was not freely and voluntarily given, suppression is not justified because the officers acted in good faith. In sum, the government contends that both motions should be denied.

2. The government has only challenged the standing of the passenger, Alvarez-Mora, to object to the car stop. During a

traffic stop, a passenger is "seized" for Fourth Amendment purposes and thus has standing to challenge the validity of the stop at issue. <u>Brendlin v. California</u>, 551 U.S. 249, 251 (2007). However, the passenger's right to contest a subsequent search not of his or her person but the vehicle remains subject to analysis under <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978). <u>United States v. Cortez-Galaviz</u>, 495 F.3d 1203, 1206 (10th Cir. 2007). In <u>Rakas</u>, the Supreme Court held that a passenger who asserts neither a possessory nor a property interest in a vehicle "would not normally have legitimate expectation of privacy" in the vehicle protected by the Fourth Amendment. <u>Rakas</u>, 439 U.S. at 148-49. Alvarez-Mora was a passenger in the truck and does not assert any possessory or property interest in it. Thus, the government's argument that he lacks standing to challenge the vehicle search has merit. Alvarez-Mora does, however, have standing to challenge the stop as well as his own detention.

3. A traffic stop is a seizure under the Fourth Amendment. <u>United States v. Taverna</u>, 348 F.3d 873, 877 (10th Cir. 2003). To lawfully initiate a traffic stop, "the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." <u>United States v. Soto</u>, 988 F.2d 1548, 1554 (10th Cir. 1993). Thus, the constitutionality of an initial stop depends upon whether the detaining officer "had reasonable suspicion that this particular motorist violated any one

of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotation marks omitted). Neither defendant has suggested that the initial stop was improper. They appear to agree that the officers had reasonable suspicion to stop the truck based upon its failure to stop at the stop sign. The court finds that the initial stop was proper because the evidence is clear that Trooper Ranieri had reasonable suspicion to believe that the vehicle had failed to stop as required by the stop sign at the end of the exit.

4. Next, the court shall consider the continuing detention of the defendants after the initial stop. The defendants contend that their continued detention after the initial stop was unreasonable. The defendants suggest that there was no reason to detain them after the issuance of the warning ticket. During a routine traffic stop, the detaining officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle. United States v. Miller, 84 F.3d 1244, 1250 (10th Cir.), cert. denied, 519 U.S. 985 (1996). The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning. United States v. Martinez, 983 F.2d 968, 974 (10th Cir. 1992), cert. denied, 508 U.S. 922 (1993). However, if the officer

12

wants to detain the driver for further questioning, he may do so if "(1) 'during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity;' or (2) 'the driver voluntarily consents to the officer's additional questioning.'" United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997) (quoting United States v. Sandoval, 29 F.3d 537, 540 (10th Cir. 1994)).  If the officer continues to question the driver in the absence of either of these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms."  Id. (internal quotations and citation omitted).

5.  The government has suggested that Troooper Ranieri could continue to detain the defendants because he had an objectively reasonable and articulable suspicion that they were engaged in illegal activity.  In determining whether an officer had reasonable suspicion to continue to detain a driver after returning the driver's paperwork and issuing a warning ticket, the court looks to "the totality of the circumstances to see whether the officer had a particularized and objective basis for suspecting legal wrongdoing." United States v. Williams, 403 F.3d 1203, 1207 (10th Cir. 2005) (quotations omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information

13

available to them that might elude an untrained person." <u>United States v. Santos</u>, 403 F.3d 1120, 1134 (10th Cir. 2005) (quotations omitted). The court must give deference to "an officer's ability to distinguish between innocent and suspicious actions." <u>Williams</u>, 403 F.3d at 1207. "Reasonable suspicion, however, may not be derived from inchoate suspicions and unparticularized hunches." <u>United States v. Williams</u>, 271 F.3d 1262, 1268 (10th Cir. 2001), <u>cert. denied</u>, 535 U.S. 1019 (2002).

6. Here, Trooper Ranieri detained the defendants after Alvarez-Mora refused to consent to a search of the truck. In evaluating the totality of the circumstances, the court finds that the following factors show an objectively reasonable and articulable suspicion that the truck contained illegal drugs: the nervousness of the defendants, the smell of both raw and burnt marijuana, the defendants were not the owners of the truck, the travel plans offered by the defendants, and the explanation of the defendants for exiting the highway at that location, including the fact they had exited just after seeing a sign for a drug check lane ahead. The court notes that most of these factors, particularly when viewed in isolation, may not raise a reasonable suspicion of criminal activity. But, certainly in the aggregate and with the smell of marijuana found by Trooper Ranieri, the court must conclude that they met the requisite standard. The court is aware that nervousness is of limited significance in determining

14

reasonable suspicion, but extreme nervousness or prolonged nervousness may be considered.  See United States v. Ludwig, ___ F.3d ___, 2011 WL 1533520 at * 5 (10th Cir. 2011).  Here, Trooper Ranieri noted that both occupants appeared extremely nervous during the encounter.  Moreover, Villalobos-Castillo appeared to "freeze up" when he was asked why he had exited I-70 at that location. This factor is certainly not determinative or even significant, but can be considered in evaluating all of the aforementioned factors.  The court also notes that Trooper Ranieri smelled an air freshener when he stood at the window of the pickup truck.  It is clearly understood that drug couriers often use air fresheners to mask the odor of illegal drugs.  Id. at * 3.  There is little question that this factor can contribute to the reasonable suspicion analysis.  Id.  Next, the court notes that Trooper Ranieri found that the defendants' explanation of their travel plans was unusual.  He noted initially that the clothes they were wearing did not appear to have been worn while performing construction work after they indicated that they were returning from a construction job in Junction City.  He further noted that their explanation for taking an exit that did not lead to their suggested destination of Wamego, Kansas also was suspicious. Bizarre travel plans or explanations about the purpose of the travel may, by themselves, contribute to reasonable suspicion.  Id. at * 4.  Here, the explanations offered by the defendants could

15

properly be considered in determining reasonable suspicion.
Trooper Ranieri also found it suspicious that the occupants were
driving a vehicle registered to another party. This is a factor
that courts have often found may "indicat[e] a stolen vehicle or
drug trafficking." Id. at * 4 (citation omitted). Thus, this
circumstance also contributes to the reasonable suspicion calculus.
Next, the court notes that Trooper Ranieri was suspicious that the
pickup truck exited I-70 at Exit 322 following the signs indicating
that a drug check lane was ahead. Again, this is another factor
that the officer can consider in determining reasonable suspicion.
See United States v. Lambert, 351 F.Supp.2d 1154, 1160-61 (D.Kan.
2004) (highway patrol trooper had reasonable suspicion for
investigatory detention of defendant where it was reasonable to
infer that defendant took highway exit to avoid what he believed
was drug check lane ahead). Finally, and perhaps most importantly,
once Trooper Ranieri smelled the odor of raw and burnt marijuana
emanating from the truck, he had reasonable suspicion to detain the
occupants and probable cause to search the truck. The Fourth
Amendment requires, as a general matter, that police procure a
warrant before searching or seizing property. Arizona v. Gant, 556
U.S. ___, 129 S.Ct. 1710, 1716 (2009). An exception to the Fourth
Amendment's warrant requirement is the automobile exception.
United States v. Sparks, 291 F.3d 683, 690 (10th Cir. 2002). Under
this exception, an officer who has "probable cause to believe there

16

is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." Id. (quotations omitted). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825 (1982). An officer has probable cause to search a vehicle if "under the totality of the circumstances there is a fair probability that the car contains contraband or evidence." United States v. Jurado-Vallejo, 380 F.3d 1235, 1238 (10th Cir. 2004) (quotations and emphasis omitted). "In determining whether probable cause exists, an officer may draw inferences based on his own experience." Id. (quotations omitted). The odor of the marijuana coupled with the other factors provided probable cause to search the truck without any further need for a search warrant. United States v. Zabala, 346 F.3d 1255, 1259 (10th Cir. 2003); United States v. Morin, 949 F.2d 297, 300 (10th Cir. 1991).

7.   In sum, the court shall deny the motions to suppress directed at the search of the truck. The evidence seized from the truck shall not be suppressed.

8.   The court shall now turn to the motion to suppress filed by defendant Alvarez-Mora. "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does

17

not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." <u>Illinois v. Rodriquez</u>, 497 U.S. 177, 181 (1990) (internal citations omitted).

9. The first issue concerns whether Alvarez had actual or apparent authority to allow the officers into the house. Actual authority, which the government must prove by a preponderance of evidence, rests on the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." <u>United States v. Matlock</u>, 415 U.S. 164, 171 n. 7 (1974). The Tenth Circuit has further clarified that actual authority requires "either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." <u>United Stats v. Rith</u>, 164 F.3d 1323, 1329 (10th Cir. 1999). Apparent authority exists when officers reasonably, even if erroneously, believe that the person allowing entry has the authority to do so. <u>See Rodriquez</u>, 497 U.S. at 188-89. The court is not persuaded that the government has proved by a preponderance of the evidence that Alvarez had actual authority to allow the officers into the house. However, the court is persuaded that

apparent authority has been demonstrated because the officers reasonably believed that Alvarez had authority to allow them to enter. The facts available to the officers at the time entry was allowed would warrant a person of reasonable caution to believe that Alvarez had authority to allow others to enter the residence. Because the officers reasonably believed that Alvarez had authority to allow them entrance into the house, no Fourth Amendment violation occurred.

10. Next, the court must consider whether Alvarez gave the officers consent to enter the house. Consent must be freely and voluntarily given. Whether an individual freely and voluntarily gave his consent is a question of fact and is determined from the totality of the circumstances." United States v. Pena, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal citations and punctuation omitted). Alvarez testified before this court that the officers just "came in" when he went to the door. He stated they did not ask for permission and did not question him about whether he lived there. The court did not find this testimony credible. Both Officers Scurlock and Youse testified that Officer Scurlock knocked on the door and when Alvarez answered, Officer Scurlock identified himself and asked for permission to enter. Both officers recall that Alvarez indicated by some verbiage, although neither can remember the exact words he used, that they could enter the house. The court found this testimony credible. The court notes in

support of this finding that Ms. Robles testified that she never raised any objection to the officers' entry into the house. The court finds that consent to enter was given by Alvarez.

11. Finally, the court turns to the issue of whether Ms. Robles gave consent to search her residence. Once again, the court must find that the consent was "freely and voluntarily given." Voluntariness is a question of fact to be decided based on the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973). Consent is voluntary if, in light of all the circumstances, a reasonable person would have felt free to decline the request to consent. United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007). Ms. Robles testified that she was never asked for permission to search the house. She stated that the officers said only that there were drugs in the house and began to search it. The court did not find this testimony credible. All of the officers testified that Officer Scurlock specifically asked Ms. Robles if they could search the house. All of the officers also stated that Ms. Robles appeared to understand the question and did not hesitate in providing consent. The court found this testimony credible. The court is thoroughly persuaded that Ms. Robles consented to a search of her residence. The court also finds that this consent was freely and voluntarily given. The court found no evidence of coercion during the encounter.

12. With the aforementioned decisions, the court finds that

20

Alvarez-Mora's motion to suppress directed at the search of his residence shall be denied.  The evidence seized from the house shall not be suppressed.

**IT IS THEREFORE ORDERED** that the following motions be hereby denied:  (1) defendant Villalobos-Castillo's motion to suppress search of vehicle and evidence seized (Doc. #29); and (2) defendant Alvarez-Mora's motion to suppress (Doc. # 33).

**IT IS SO ORDERED.**

Dated this 26th day of May, 2011 at Topeka, Kansas.

                              s/Richard D. Rogers
                              United States District Judge